MOHR v. HAMPTON.

5-3268                                    382 S. W. 2d 6

Opinion delivered September 21, 1964.

*Gus R. Camp, James Foreman,* Metropolis, Illinois, for appellant.

*Howard A. Mayes, Kirsch, Cathey & Brown,* for appellee.

FRANK HOLT, Associate Justice. The appellants brought this action to establish ownership of $16,418.00 in cash and securities in their uncle's lock box by gift inter vivos or causa mortis. The Chancellor held that the decedent did not make a gift in either manner to the appellants. On appeal the appellants contend "that the proof substantiates a gift either inter vivos or causa mortis."

The decedent, Fred Folks, was 67 years of age at the time of his death. His permanent residence was in Rector, Arkansas where he had resided in the home of his aunt, Mrs. Adelia Hampton, for many years. Folks had been estranged from his divorced wife since 1931. His relationship with his daughter, Chelsene Lohranz, and only surviving heir, was marked by occasional correspondence and visits. He made annual visits to his home town of Vienna, Illinois to see his sister, the mother of the appellants, until her death in May, 1962. Folks' next visit to Vienna was on December 22, 1962. On this occasion he was visiting in the home of appellant, Mary Georgia Elliott, his niece, and her husband, Don Elliott. Except for a one-day return trip to Rector to attend to some business matters he remained in their home until his death on January 21, 1963.

Don Elliott testified that he was awakened about 11 or 11:30 P.M. by Folks who complained of being short-winded. After walking around, Folks stated he was better and returned to bed. Folks had previously complained of a heart ailment. Shortly thereafter Folks again called Elliott. Dr. Wakefield came to the Elliott home and an ambulance was summoned for the purpose of removing Folks to the hospital if it became necessary. Mr. and Mrs. Elliott, Dr. Wakefield, J. W. Robinson,

owner of the ambulance and funeral director, his assistant, Mr. Lillidoll, Ernestine Mohr, appellant and Folks' niece, and her hubsand, Ernest Mohr, were all present in the Elliott house where Folks died at 1:15 A.M. Only two witnesses, Don Elliott and J. W. Robinson, testified as to any knowledge of the alleged gift which occurred during the last ten or fifteen minutes of Folks' life.

Elliott's first version of what occurred at the time of the alleged gift was that while the doctor was making arrangements on the phone for Folks' admittance to the hospital, Folks asked for his overalls and pulled out a little blue book [a savings account book indicating a balance of $2,815.64 in a Kennett, Missouri bank] and "these keys and he just opened it up and he put them in there like that and * * *" he asked me to give them to Mary Georgia and Ernestine [appellants] and said: "These keys is theirs and whatever is behind that lock belongs to them. Don't give the others a thing"; that he, Elliott, then gave his wife and sister-in-law each a key. Upon further questioning Elliott declared the decedent told him the lock box was in the Bank of Rector. Elliott first testified that when Folks placed the keys in the bank book there were two sets of keys; one consisting of the two lock box keys and the other set consisting of three keys. On further questioning Elliott testified that in addition to the two separate sets there was a loose key which later proved to be a key to the Dalton Hardware Store in Rector where decedent kept his carpentry tools. Elliott and appellants declared emphatically that each of appellants thereafter retained in their exclusive possession the lock box key which he had given to them and at no time thereafter were the lock box keys placed on a ring with the other keys.

This testimony is squarely contradicted by Arthur McNiel whom appellants visited in Rector the day following their uncle's death for the purpose of establishing if a will existed. Mr. McNiel testified that appellants and their husbands showed him several keys which were together on a ring or string; that he voluntarily identified the lock box key; that neither the appellants nor

their husbands indicated that they had any knowledge of the fact that the key was to a lock box and made no statements concerning their claim of ownership to its contents; that they questioned him concerning a will and that he told them he had advised Folks to make a will but that he knew of none.

After their conversation with McNiel, appellants and their husbands went to the Bank of Rector and talked to Miss Mary Lee Hill, an official of that bank. She testified that they told her the funeral director had asked the nieces to guarantee payment of the funeral expenses and "they told me that they didn't know if he had one [a will] and then they presented this key which they said they thought might be a key to a lock box". Whereupon she ascertained from the bank records that it was the key to a box in her bank; then they asked permission to examine the box to see if it contained a will; that this was permitted and no will was found; that upon examining the contents of the box it was observed that the box contained an undetermined amount of money and securities and that the appellants asserted no claim whatsoever to the ownership of the contents of the box at that time. She testified that it was on February 20, 1963, or a month later, that the bank first learned about such a claim when an Illinois attorney called and advised that he represented appellants who were claiming the contents of the box by virtue of a gift from their uncle: "Of course we don't know whether there's anything in the box or not."

Elliott testified on cross-examination that after Folks had given the keys to him Folks took $10.00 from his pocket while they were getting him on the stretcher and handed it to his niece, Mrs. Elliott, the appellant, with the statement that the money was to be used by her and her sister, Mrs. Mohr, to buy cigarettes for him while he was in the hospital. This does not indicate that Folks was apprehensive of impending death.

Mr. Robinson was the only other witness present at the time of the alleged gift. To some extent his testimony

corroborated Don Elliott's. However, in other respects it was contradictory.

An asserted gift, whether causa mortis or inter vivos, must be established by evidence which is "clear and convincing". *Smith* v. *Clark,* 219 Ark. 751, 244 S. W. 2d 776; *Lowe* v. *Hart,* 93 Ark. 548, 125 S. W. 1030. In *Baugh* v. *Howze,* 211 Ark. 222, 199 S. W. 2d 940, we said that to constitute a gift inter vivos there must be, among other essential elements, "a clear intent to make an immediate present and final gift beyond recall and at the same time unconditionally releasing all future dominion and control by the donor over the property so delivered." See, also, *Bennett* v. *Miles,* 212 Ark. 273, 205 S. W. 2d 451.

Further, the tenor of appellants' evidence is that a close relationship existed between them and their uncle. In *Baker* v. *Eibler,* 216 Ark. 213, 224 S. W. 2d 820, we said:

"The claim of a gift causa mortis, where a confidential relationship exists, * * * *imposes a heavy duty of proof on the claimant.* A rebuttable presumption arises from the mere existence of the relationship that the gift was obtained by undue influence or improper means. The burden is on the alleged donee to rebut this presumption and to establish that the claimed gift was fairly and properly made to him." [Emphasis added.]

We agree with Chancellor that the appellants have not met the burden of proof necessary to establish the asserted gift inter vivos or causa mortis by the required standard of clear and convincing evidence. Certainly it cannot be said that the Chancellor's findings are against the preponderance of the evidence.

The decree is affirmed.